**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 08-0753-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| Juan Antona-Flores also known as Jose Romero-Galvez, | |
| Defendant. | |

Defendant Juan Antona-Flores has filed a motion to dismiss the indictment (Dkt. #18) and a motion challenging the voluntariness of statements made to Government agents (Dkt. #32). The parties have fully briefed the issues. An evidentiary hearing was held on February 24, 2009. For the following reasons, the Court will deny both motions.

**I.    MOTION TO DISMISS.**

Defendant is charged with being an alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). To establish that Defendant is guilty of this crime, the Government must prove that he was illegally in the United States at the time he possessed the firearm. *Id*. Defendant contends that he was arrested in Mexico and that the Government cannot prove he was in the United States on the night of his arrest.

Defendant was arrested west of the City of San Luis, Arizona. The border between Mexico and the United States in this location runs generally in a north-south direction, with Mexico on the west and the United States on the east. The border follows the former path

1  of the Colorado River, and thus weaves back and forth through the river bottom.
2  Government Exhibit 3, received in evidence during the hearing, is an aerial photograph of
3  the area with various landmarks labeled. The Salinity Canal is located in the United States
4  to the east side of the Colorado River bottom. It runs north and south, with a dirt road on
5  both sides of the canal and a secondary boundary fence just east of the canal. Thus, illegal
6  aliens attempting to cross the border in this area would be required to walk east across the
7  river bottom, swim the canal, and climb over, under, or through the secondary fence.

8  Border Patrol Agent Daniel Martinez testified to the events that occurred on
9  June 14, 2008, the date of Defendant's arrest. At approximately 10:10 p.m., Agent Martinez
10 was driving south down the road on the east side of the Salinity Canal. Agent Martinez saw
11 the silhouette of a person up ahead. The person appeared to be moving west toward Mexico.
12 Agent Martinez then came upon a hole in the secondary boundary fence and footprints
13 around the hole that ultimately appeared to head west toward the canal and Mexico. Agent
14 Martinez called for back-up from Agent Andrew Fitzpatrick. The two of them drove north
15 along the canal road to County Road 21, where they crossed a bridge over the canal and
16 drove south along the west side of the canal.

17 Agents Martinez and Fitzpatrick located footprints at the approximate location of the
18 hole in the fence. Agent Martinez testified that they began following the footprints into the
19 river bottom. After quietly tracking the footprints for some time – neither agent could recall
20 how long – they came upon a group of five to seven people hiding in the brush. When they
21 identified themselves as Border Patrol agents, the group broke and ran. The agents ran after
22 one of the individuals, eventually tackling and handcuffing him. This individual, who turned
23 out to be Defendant, had an AK-47 rifle beneath his body in the location where he was
24 arrested. He also had ammunition in his possession. Agent Fitzpatrick had heard Defendant
25 "racking" the gun to place a round in the chamber as he ran. After Defendant's arrest, the
26 agents found a round in the chamber of the rifle.

27 Agent Martinez testified that he has been field trained to know the location of the
28 international boundary in this area, and is careful not to cross it. Agent Martinez testified

that Defendant was arrested within the United States. He noted that there is a wash that one arrives at before reaching the boundary, and that he and Agent Fitzpatrick arrested Defendant before reaching the wash.

Agent Fitzpatrick testified that he too has been trained on the location of the boundary in the river bottom. He has received field training and has made many arrests in the area. In addition, Agent Fitzpatrick was assigned for six months to fly up and down the border in a helicopter looking for injured aliens. Because the helicopter was not permitted to enter Mexican airspace, it would follow the boundary through the river bottom area. These flights further increased Agent Fitzpatrick's knowledge of the boundary. Like Agent Martinez, Agent Fitzpatrick testified without equivocation that Defendant was arrested in the United States.

On the night of Defendant's arrest, Border Patrol Agent Chris Beattie was asked to provide assistance at the arrest location. When he arrived at the location where Border Patrol agents had assembled on the canal road, Agents Martinez and Fitzpatrick were no longer there. Agent Beattie followed footprints into the river bottom to a location that appeared to be the spot of the arrest. He took GPS coordinates at this location. These coordinates subsequently were provided to Defendant's counsel during discovery.

Approximately four months after the arrest, Defendant filed the motion to dismiss, alleging that he was arrested in Mexico. After receiving the motion, the Government asked Agent Martinez to confirm the location of the arrest. Agent Martinez returned to the river bottom with Agent Beattie and walked to the location where Agent Beattie had taken the GPS coordinates. Agent Martinez told Agent Beattie that this was not the location of the arrest. Agent Martinez took Agent Beattie to the actual point of arrest, which was north and west of Agent Beattie's original GPS readings and closer to the border. Agent Beattie took a second set of GPS coordinates which were provided to defense counsel in subsequent discovery. Defendant stipulated at the hearing that this set of coordinates, as well as the first set, are located within the United States.

1    Defendant cross-examined the Government's witnesses during the evidentiary
2 hearing, but otherwise presented no evidence. Defendant argues that several facts show the
3 agents' account of the arrest location to be incorrect.

4    First, Defendant noted during cross-examination that the reports prepared by the
5 agents stated that the footprints near the hole in the fence headed west. Defendant argued
6 that a person heading west from this location would soon enter Mexico, and that the agents
7 could not have tracked the aliens west for more than a few minutes without entering Mexico.

8    The Court is not persuaded by this argument. Although it is true that the agents'
9 reports apparently refer to tracks heading west, Agent Martinez testified that the hole in the
10 fence was located approximately 20 yards north of County Road 22. He further testified that
11 the footprints he and Agent Fitzpatrick found after driving across the canal and down the
12 west side of the canal were located at about County Road 22. As shown in Government's
13 Exhibit 3, walking west from County Road 22 would not cause the agents to enter Mexico
14 before reaching Defendant's arrest location. The arrest location comports with the agents'
15 testimony that they headed west after locating the tracks at County Road 22.

16    Second, Defendant notes that neither agent was able to testify that Defendant's clothes
17 were wet. From this, he asserts that his clothes were dry and that he therefore could not have
18 crossed the canal to the hole in the fence. But the agents never testified that they saw
19 Defendant on the east side of the canal. Agent Martinez saw only a silhouette as he drove
20 down the canal road. The agents later came upon Defendant and others in the group after
21 following footprints they found on the west side of the canal. Defendant would not have had
22 to swim the canal to be found in the river bottom.

23    Third, Defendant argued that the agents said the arrest occurred "near" the Colorado
24 River. Defendant argues that if one moves due west from the hole in the fence to the river,
25 one clearly is located in Mexico. As noted above, however, Agent Martinez testified that the
26 hole in the fence was only 20 yards north of County Road 22, and that the footprints on the
27 west side of the canal were found at County Road 22. As defense counsel conceded during
28 oral argument, a person heading due west from this location to the river would arrive at the

- 4 -

1 point where Agent Martinez said the arrest occurred – a point Defendant concedes to be
2 within the United States.

3 Finally, Defendant notes that the arrest occurred at night and that the river bottom is
4 a flat, brush-filled area. Defendant argued that it is highly unlikely Agent Martinez could
5 find the precise location of the arrest more than four months after it occurred. Agents
6 Martinez and Fitzpatrick both testified, however, that they are very familiar with the area and
7 have worked there often. Agent Martinez further testified that there was a full moon on the
8 night of the arrest, making the area very visible.

9 The Court finds the testimony of Agents Martinez and Fitzpatrick to be credible. Both
10 testified without hesitation that the location of the arrest is within the United States. The
11 GPS coordinates confirm that the location is within the United States. The Government has
12 established the location of the arrest through credible testimony. Defendant's arguments do
13 not detract from this evidence

14 **II.    VOLUNTARINESS OF STATEMENT.**

15     **A.    Statements to Agents Jimenez and Balarezo.**

16 Defendant challenged the voluntariness of his statements made to Border Patrol
17 Agents Jimenez and Balarezo following his arrest on June 14, 2008. Defendant's challenge
18 is based on the fact that he was not given a *Miranda* warning before speaking with these
19 agents. In response, the Government stated that it does not intend to use these statements
20 during its case-in-chief. Dkt. #46. The statements will be used, if at all, only for
21 impeachment if Defendant elects to testify. *Id.* On the basis of this assertion, defense
22 counsel agreed that there is no need to address the voluntariness of these statements.

23     **B.    Defendant's Custodial Interrogation.**

24 Defendant challenges the voluntariness of his custodial interrogation on the evening
25 of June 14, 2008, at the Yuma Field Office. Defendant notes that he was clothed only in
26 boxer shorts, that he was cold, and that he appeared to be ill. Defendant concedes that he
27 received *Miranda* warnings prior to the interview, but contends that the circumstances of the
28 interview made it coercive.

- 5 -

1  The Court has reviewed the entire videotape of this interrogation, and concludes that Defendant's statements were voluntary. Although Defendant sat through much of the interview with his head down, sometimes near the table, he did the same during the evidentiary hearing in this case. Agents asked Defendant at the beginning of the interview is he was "alright," and he said yes. After Defendant's rights were read to him in Spanish, he signed the written waiver form. Most of the interview was then conducted in English, which Defendant speaks well.[1]

Defendant was in boxer shorts, but did not appear to be uncomfortable or embarrassed. When Defendant said he was cold, agents immediately retrieved two blankets. Agents placed one over him and placed the second on the floor next to him. Agents asked Defendant if he felt better, and he said yes. During the remainder of the interview, Defendant did not request the second blanket or say he was cold.

The interview was conducted in a calm, non-threatening manner. There were three agents in the room, but only one asked questions at a time. Defendant answered voluntarily. He never expressed discomfort, confusion, or concern about the interview. He never requested counsel. At the end of the interview, Defendant confirmed on the videotape that he had received no promises and had suffered no threats or mistreatment.

The Court does not find the interview to have been coercive. Defendant knowingly waived his rights and voluntarily spoke with the agents.

**C.  Interview by Agent Pardo.**

Defendant was interviewed on June 15, 2008, by Border Patrol Agent Pardo. Defendant contends that this interview was tainted by the interview that occurred the evening before. As noted above, the Court does not find the prior interview to have been involuntary or coercive.

Defendant also asserts that the Pardo interview was confusing because Defendant's *Miranda* warnings stated that any statements he made could be used against him both in

---

[1] Defendant informed the Court at the beginning of the evidentiary hearing on February 24, 2009, that he did not need a Spanish intepreter.

- 6 -

criminal and administrative proceedings. In support of this argument, Defendant cites *United States v. San Juan-Cruz*, 314 F.3d 384 (9th Cir. 2002). The defendant in *San Juan-Cruz*, however, was given clearly inconsistent warnings. The first warning stated that the defendant was entitled to have an attorney present if he could afford one. The second warning stated that a lawyer would be provided if Defendant could not afford one. The Ninth Circuit found that these inconsistent warnings created confusion on a critical issue – whether Defendant was entitled to a lawyer before answering questions. *Id*. at 388-89.

No similar confusion occurred during the Pardo interview. Defendant was told that statements he made could be used against him in a criminal case or in an administrative or immigration proceeding. He was also told that he was being charged with a criminal offense. From this warning, Defendant clearly understood that any statements made to Agent Pardo could be used against him in this criminal case. He agreed that he understood the warnings and signed a waiver of rights form. The Court finds that Defendant was adequately advised of his rights in the interview by Agent Pardo.

**IT IS ORDERED:**

1. Defendant's Motion to Dismiss Indictment (Dkt. #18) is **denied**.

2. Defendant's Motion for Voluntariness Hearing (Dkt. #32) is **granted** to the extent that such a hearing has been held, but **denied** to the extent the motion seeks to suppress statements made by Defendant during the custodial interrogation on June 14, 2008, or the interview with Agent Pardo on June 15, 2008.

DATED this 25th day of February, 2009.

David G. Campbell
United States District Judge